**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

| | |
|---|---|
| AERIAL DEVELOPMENT GROUP, LLC, and AERIAL INVESTMENT PROPERTIES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CAROLINA PRIVATE FINANCIAL CORPORATION d/b/a THE FINANCIAL COPILOT and HUGH O. STEWART | Case No.: _____ <br><br><br><br> **COMPLAINT** |

Plaintiffs Aerial Development Group, LLC ("ADG") and Aerial Investment Properties, LLC ("AIP"), complaining of Defendants Carolina Private Financial Corporation ("CPFC") d/b/a The Financial CoPilot (referred to herein, "TFC") and Hugh O. Stewart ("Stewart"), allege and say as follows:

## PARTIES

1. ADG is a Tennessee Limited Liability Company with a principal place of business at 521 5th Avenue South, Nashville, Tennessee 37203.

2. AIP is a Tennessee Limited Liability Company with a principal place of business at 521 5th Avenue South, Nashville, Tennessee 37203.

3. Upon information and belief, TFC is a North Carolina Corporation with a principal office and place of business at 2504 Raeford Road, Suite 107, Fayetteville, North Carolina 28305.

4.      Upon information and belief, Stewart is an individual citizen and resident of Florida but has maintained substantial contacts with, and engaged in business within North Carolina. According to the North Carolina Secretary of State's website, Stewart has availed himself of the laws of the State of North Carolina by, among other things, incorporating, and serving as the registered agent for several companies in North Carolina, including TFC, Digital Advertising Technology Associates, LLC, Stewtellus Investments, LLC,  Property Solutions of Carolina, Ltd., and Carolina Property Rescue, Inc.

5.      Moreover, upon information and belief, Stewart is the President of TFC and oversees its operations in Fayetteville, North Carolina.

## JURISDICTION AND VENUE

6.      Complete diversity of citizenship exists between the Plaintiffs and the Defendants.

7.      The amount in controversy, exclusive of interest and costs, exceeds Seventy-Five Thousand ($75,000.00) Dollars.

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332, and venue is proper pursuant to 28 U.S.C.A. §§ 1391 and 1392.

## GENERAL FACTS

9.      ADG is a residential and commercial real estate development company based in Nashville, Tennessee. ADG further operates as a social enterprise, meaning that a percentage of its profits are donated to support charitable organizations. ADG was founded by Britnie Turner ("Turner"), a Nashville resident.

### The Financial CoPilot/Stewart

10.     According to its website, http://www.financialcopilot.com ("the website"), TFC is a sort of financial services advice and bookkeeping service. The "Services" section of the website has two categories – "Financial Services" and "Operational Services."

11.     As to "Financial Services", TFC purports to provide 3 levels of service: (1) "The Financial Control Tower™", (2) the "Contract Finance Department™", and (3) the "Multi-Dimensional Data Conversion Solution™".

12.     The "Financial Control Tower" is described as a 60-90 day process to set up an "improved financial infrastructure" which includes financial statement preparation – Profit and Loss Statements, Balance Sheets, and Cash Flow Statements. It also includes "Written Standard Operating Procedures for managing and maintaining the bookkeeping system". The pricing for the "basic package" of services is listed at $15,000.

13.     The "Contract Finance Department", according to the website, "provides a bookkeeping, accounting and CFO solution package". The website describes the services as follows:

> If you're ready for a premium level of service that continues what The Financial Control Tower™ has begun, this is for you. In this program, Carolina Private Financial Corporation provides consistent, continual management and analysis of your financial infrastructure. We customize accounting functions to your specific needs so you have efficient and effective information for making sound business decisions.

As to pricing for the second level of services: "Your initial investment is $15,000 plus $2,000 a month to take care of all your record-keeping. As a bonus you'll receive The Cash Flow Multiplier Course and you will have full access to all of Hugh's current and future teachings".

14.     The services included in the "Contract Finance Department" package are the financial statements listed in the "Financial Control Tower" package plus:

- Bank and General Ledger Account Reconciliations
- Report Review
- Accounts Receivable – Banking Deposits and Cash Management, Invoicing and A/R Aging
- Accounts Payable – Payroll, Sales/Use Tax Returns, Bill Paying, State and Federal Payroll Quarterly Filings, 1099 & 1096 Sub-contractor Reporting, W-2, W-3 and W-9 Reporting, and
- Database Design – designs a customized QuickBooks database for your unique business needs.

15.     The third level of service – the "Multi-Dimensional Data Conversion Solution™" - "migrates your detailed historical transactions from any legacy system and imports them into Intacct®". According to the website, QuickBooks is "limited to classes and locations" whereas Intacct® "creates an almost unlimited number of ways … to contextualize, track and analyze your data."  No specific pricing is given for this service – the site simply states, "We'd love to work with you! We offer affordable pricing to fit virtually any budget."

16.     As to the use of the Intacct® software, TFC is apparently a dealer for that software:

> One of our clients reached thirteen QuickBooks® Online (QBO) databases and needed a more functional solution. After four months of research we found Intacct® and were excited about the software's ability to provide user-specific dashboards, rights management, and many other features necessary for scalability and growth.
>
> *       *       *
>
> In June 2014, we became an Intacct® Accountant Partner and was [sic] shown a QuickBooks® migration tool that Intacct® offered.

17.     As to "Operational Services", there are also multiple levels of services offered: (1) "The Strategic Operations Blueprint™", "The Business Foundation Stabilize™", "The Customer Experience Optimizer™" and "The Business Empire Builder™". According to the website, if you

use these processes, you will "take your business 5-7x your current revenue levels" and that "we're typically capable of helping our clients in making that jump within 4 years."

18.     Stewart's biography on the website states that he has "been starting businesses since I was 20 years old. I've launched over 19 businesses since 2000." The bio on the website goes on to state:

> Although I've had failures, I've succeeded quite often. I've placed trust in many, and while I've been misled by some (I've even been stolen from by employees and partners), I have learned a great deal from it all.
>
> *       *       *
>
> As a result, I know how to build a financial culture that promotes collaboration. I know how to design fair compensation for partners, so that a relationship has the opportunity to thrive indefinitely.
>
> *       *       *
>
> As the person who began The Financial CoPilot, I can say with confidence that I know what I'm doing.

19.     While the TFC website is devoted to the sale of financial and business operations experience, it does not appear that Stewart, or anyone else at TFC, is a licensed Certified Public Accountant or holds any special licenses to provide accounting or financial advice. The only professional license Stewart appears to hold is as an "Engineering Intern" in Florida, which he acquired on June 21, 2001.

<u>The Services</u>

20.     Stewart began providing business coaching services to Turner in or around 2011 and offered to mentor Turner on building and growing her businesses.  Stewart offered to give Turner eight "free coaching sessions."  Stewart made many representations to Turner regarding his business experience and convinced Turner that he had the knowledge and experience to assist her in her entrepreneurial endeavors.

21.     Upon information and belief, Stewart provided the free coaching session in order to place himself in a position of trust and confidence with Turner.  Stewart did provide these coaching sessions.

22.     Thereafter, after building a relationship of trust and confidence with Turner, Stewart began offering to provide financial and accounting services for a fee to entities in which Turner held an ownership stake.  Stewart represented that TFC and he had the experience and knowledge to provide these services and help grow the businesses.

23.     Following conversations between Turner and Stewart, Turner, based on the trust and confidence she had in Stewart and based on the representations he made as to the skill and experience offered by him and TFC, Turner agreed to engage Stewart and TFC to provide certain services to Plaintiffs.

24.     Commencing in or around February 2011, TFC/Stewart began providing certain accounting and financial services to ADG and billing ADG. In reliance on the representations by Stewart in in his meetings and communications with Turner (many of which are written on the pages of the website), ADG gave control of its financial accounts to Stewart and made him a signatory for the same.  Based on the authority and control given, Stewart was, at all times pertinent hereto, able to make payments to himself and TFC from ADG accounts without notice to or authorization from anyone at ADG.

25.     Stewart after gaining control over the financial accounts of ADG, began seeking increased roles with ADG and Turner in return for additional compensation.  Stewart proposed to Turner that she should give him complete control and authority over the financial management and operational systems of Plaintiffs so as to protect her and the investors from potential fraud and mismanagement of accounts, thereby, allowing Turner to focus on the growth of the

business. Stewart stated to Turner that she did not have the experience to oversee the accounting side of the business and that he did have the skills, experience and resources to do so.

26. In or around December 2012, Stewart, prepared spreadsheet checklists for services, solutions and items that Stewart and TFC could and would provide to Plaintiffs and related entities and areas on which Stewart would provide consulting services based on his knowledge and experience in building businesses. The spreadsheet workbook is entitled "Aerial General Business Design Checklist" and a copy of the same is attached hereto as **Exhibit A** (the "Checklist").

27. At various times, ADG was presented with proposed written contracts from TFC, but was never given fully executed and dated copies by TFC (the "Contracts"). On or about August 7, 2013, Turner, as president of, and on behalf of ADG, executed a contract for the second level of service described above – "The Contract Finance Department" – for a fee of $5,200/month (the "2013 CFD Contract"). See **Exhibit B** hereto. As noted above, the ordinary pricing for this service stated on the website, was "Your initial investment is $15,000 plus $2,000 a month to take care of all your record-keeping. As a bonus you'll receive The Cash Flow Multiplier Course and you will have full access to all of Hugh's current and future teachings."

28. The 2013 CFD Contract states on its face that it is a "First Addendum to Aerial Investment Properties a/k/a Aerial Development Group Agreement."

29. Soon after the 2013 CFD was signed, Stewart demanded more compensation and represented that he would have to hire additional personnel to provide the agreed services to Plaintiffs. Stewart represented to Turner that all services were not being provided in a timely manner due to his need for additional staffing. Stewart further stated that his services were in

high demand and he had other clients and in order to keep providing services to Plaintiffs, additional compensation was necessary.

30.     At some point thereafter, another "First Addendum to Aerial Investment Properties a/k/a Aerial Development Group Agreement" was submitted by TFC ("the Proposed Addendum"), however, in this version the fee has jumped to $8,250/month, or roughly four times the amount these services are represented to cost on the website. See **Exhibit C** hereto. ADG is not aware of whether or not the Proposed Addendum was fully executed and never received an executed copy from Defendants, but TFC billed that amount for services after submitting the Proposed Addendum.

31.     Additionally, Stewart requested that ADG hire a full-time employee to assist him and TFC in providing the agreed-upon services.  Stewart selected the person to hire and ADG hired him at a salary of $5,500.00 per month based on Stewart's recommendation.  This employee was eventually terminated due to his lack of skill and ability to complete the tasks with which he was assigned by Stewart.

32.     Despite billing ADG many times the ordinary and stated cost for the service fees for FCP's "Contract Finance Department" package, TFC and Stewart failed to provide any of the services promised in a timely, competent and workmanlike manner and, oftentimes, completely failed to provide certain services within their scope of obligations.

33.     Specifically, Mark Biersmith ("Biersmith"), who was hired as the President and Chief Operating Officer of ADG on or about January 26, 20155, began in February 2015 to review the various financial statements prepared by Stewart. Upon review, Biersmith discovered that none of the financial statements were accurate and would require substantial revision.

34. The importance of accuracy of financial statements is specifically emphasized on the TFC website, which states, under the heading "Exacting Attention": The Financial Co-Pilot's work is thorough and exacting. … Its record for accuracy is fantastic! … This high-order attention to detail is the cornerstone of financial success." In fact, on the "philosophy" section of the website, it states that the value of the services provided by TFC is that it allows the company executives to focus on other areas of the business and not spend time reviewing financial information: "Trusting and effectively controlling your financial system allows you to delegate more confidently. This is because **error, theft and fraud have been eliminated**." [Emphasis in original.]

35. In addition to being incorrect, the erroneous financial statements prepared by Stewart/ TFC were never delivered in a timely manner. Biersmith has discovered that statements were sometimes 90 to 160 days late. The lateness of the statements and their inaccuracy not only damaged ADG's ability to effectively manage its operations and timely file accurate tax returns and filings, but subjects TFC to a liquidated damages penalty under the Contracts, which provides that: "If it is determined that all required information was provided to CPFC for reports to be provided on the dates, and CPFC fails to deliver accurate reports listed in the schedule above, a penalty of $150/day will be levied on the subsequent invoice."

36. As to the type of statements delivered, while the Contracts require that numerous financial statements be delivered, upon information and belief, only one Cash Flow Statement was ever delivered by TFC, despite being a specifically listed document in the Contracts. This failure alone would subject TFC to penalties of either $150/day or $250/day (the rate changed in the different versions) under the Contracts for almost the entire period services were being billed,

subjecting TFC to contractual penalties of somewhere between $173,250 and $288,750 (1,155 days at either $150 or $250 per day).

37. The failure to have accurate and timely financial statements not only impacted ADG's operations and tax filings, but its ability to raise capital for investment, the lifeblood of any development company. The importance of financial statements in capital generation is specifically acknowledged on the website:

> You also have an easier time engaging in conversations about raising capital because your system reveals how your business operates in a more clear and professional way. As a result, you will be able to communicate with investors and lenders effectively due to your increased confidence and understanding.

38. As a result of Defendants' failure to provide accurate and timely financial statements to Plaintiffs, Plaintiffs were unable to obtain financing in 2014 for the purchase and development of certain properties, thereby, losing those opportunities and revenues estimated in excess of one million dollars.

39. Upon information and belief, due to the ACH access Stewart had with ADG's accounts, rather than submitting invoices and calculating the penalties as required by the Contracts, Stewart simply withdrew funds each month to cover the amount of whatever version of the Contracts he believed were in effect, or felt he wanted to charge, at the time. In total, ADG believes Stewart paid TFC a total of $139,960.58 for "CFO" services under the Contracts.

40. Moreover, in addition to the fees being billed by TFC, beginning in the fall of 2013, Stewart started withdrawing funds for "extended" and "special" services (discussed at length below). ADG believes Stewart, using his ACH authority, withdrew approximately $126,500 from ADG's accounts for "extended services" and $49,500 for "special services".

Finally, Stewart withdrew $8,591.27 for fees for the use of the Intacct software he had allegedly used for ADG. As noted above, this was a self-dealing transaction as Stewart is an Intacct dealer.

41.     In total, ADG believes that Stewart withdrew $324,551.85 from ADG's accounts for services that were either never provided, or provided in a deficient, defective and untimely manner, in breach of his fiduciary obligations and the timelines, requirements and obligations set out in the Contracts.

42.     The conversion of these funds by Stewart is particularly ironic given the core statement on his website about his reason for creating TFC:

> Having been in a situation where I was vulnerable to my service providers: an accountant that simply processed our taxes but gave little operational support, bookkeepers that were incompetent at best and negligent at worst, and employees who gamed the internal financial system to steal tens of thousands of dollars from my business, I decided that no business owner should ever have to experience what I experienced.
>
> ~ Hugh O. Stewart (founder of The Financial CoPilot)

43.     As to damages, ADG has employed a third-party auditor to review all financial statements and billings by Stewart and TFC and will supplement the damages estimates set forth herein after the audit is complete and ADG has finished its internal review.

## The Alleged "Partnership Interest"

44.     One of the main themes of the TFC website is "delegation" or "outsourcing" work away from the CEO or salespeople so that they can focus their energies on "what they do best" and leave the operational and financial systems to be handled by trusted delegates.

45.     Thus, in addition to billing ADG for financial services, in Fall 2012, Stewart began pressuring Turner to increase Stewart's role with ADG so that he could take on a larger role in ADG and allow her more time to focus on sales and development.

46.     Stewart sent the Checklist and stated that these were the areas in which he could assist Turner and Plaintiffs and, if he was made a partner, he would provide consultation and the services at a reduced rate in return for an equity position.

47.     In or around May 2013, Turner told Stewart that if he completed these services and setup the systems for the Company within two years for negotiated fees, she would consider giving him an ownership interest in ADG.  Between May 2013 and September 2013, Stewart failed to make any progress with regards to the Checklist.

48.     Stewart then approached Turner in September/October 2013 and demanded that he be made a partner and given an ownership interest and that Turner increase his role in the management of the companies.  Specifically, Stewart represented to Turner, consistent with the various statements on the website, that Turner's focus should be vision and project setting leaving Stewart to manage all operations and administration for ADG's operations. See, e.g., October 4, 2013 e-mail from Stewart to Turner, a copy of which is attached as **Exhibit D** hereto.

49.     Stewart represented to Turner that she needed to have a split in the ownership structure of ADG in order to "facilitate future lending."

50.     Stewart stated to Turner that the current compensation he and TFC was receiving was not adequate and did not justify the time he was personally spending with regards to providing services for the Plaintiffs and that he could earn more from other potential clients. Stewart stated that his phone had been ringing ever since once of his clients received a national honor and that many others now wanted his services.

51.     What followed was a series of negotiations about specific services Stewart could provide and possible compensation models for the same. Specifically, Stewart represented that

while his normal rate for personal services was often $2,000 - $2,500/hour or more, he would be willing, as a favor to Turner, to take an ownership percentage of ADG in lieu of hourly fees.

52.     On or about May/June 2013, Stewart submitted to Turner a memorandum purporting to state the benefits and services that Stewart would provide and a proposed division of profits (the "Memorandum", a copy of which is attached as **Exhibit E** hereto). The Memorandum begins: "Below are some considerations for the redevelopment of Aerial Development Group and the **potential** partnership of Britnie Turner and CPFC c/o Hugh Stewart". [Emphasis added].

53.     In the Memorandum, Stewart wrote that the term of the partnership would be "Indefinite – for the life of mutually owned entities and at the mutual discretion of the Involved Parties". The "Involved Parties" are defined as "Aerial Development Group" and "Carolina Private Financial Corporation c/o Hugh Stewart". In the "Initial Capital" portion of the Memorandum, Stewart's sole alleged capital contribution to the partnership is stated thus:

> Hugh Stewart: $77,000 of consulting services provided between the months of May-September 30th, 2013.

54.     To the extent additional capital is required, the Memorandum states that Turner will be solely responsible for any capital calls necessitated, and that Stewart will specifically not be responsible for any additional capital.

55.     In other words, other than the alleged 5 months of unspecified "services" which were to be provided by Stewart (at an alleged cost of $15,400/month), all assets and capital contributed to the proposed partnership were to be contributed by Turner alone, and all capital to be provided to the proposed partnership in the future would be provided by Turner alone.

56.     Stewart's proposed compensation in the Memorandum is broken into a monthly

fee plus an ownership interest. As to the monthly compensation, Stewart proposed:

> For the additional operational services performed by Hugh Stewart, CPFC will be paid
> $5,750/mo for the role of operations, finance and Fayetteville liaison.

Why ADG would possibly need a "Fayetteville liaison" when it had no assets, operations or

developments in Fayetteville is not stated. In actual fact, the only connection ADG had to

Fayetteville was that TFC's headquarters and employees (other than Stewart) were located there.

57.     As to Stewart's new "services", those listed above appear to be things that were

already being provided to ADG under the Contracts. As to any new services he was to provide (at

a value of $15,400/month in credit as his capital contribution), they appear to be things that are

utterly impossible to provide remotely from his location in Florida. The specific duties of Stewart

under the proposed partnership are:

> CPFC c/o Hugh Stewart: Leadership of financial analysis/accounting team.
> Administration – oversee office administration, paperwork, filing, Operations:
> streamlining of employee workflows and accountability. Establish metrics for company
> positions and monitor deal and employee efficiency and profitability. Document SOPs for
> all major business functions and facilitate employee training on those functions.
> Assistance in legal matters and negotiations. Oversight of insurance plan implementation.
> Execute company asset protection plan.

58.     For the provision of these services, Stewart proposed that he receive not only the

$5,740/month quoted above, and a $77,000 capital account credit, but also:

> "Hugh Stewart will eventually control (after a 3 month vesting period ending
> September 30, 2013) 12% of the company through the ownership of an entity of
> his choice: This ownership will be transferred through the use of a warrant.

59.     Unbelievably, in addition to wanting 12% of the company, a $77,000 capital

account credit, and $5,740/month, Stewart also proposed quarterly distributions to himself and

Turner. Although Turners' contributions were to be treated as a "member draw", Stewart's distributions were to be "made to CPFC in the form of a consulting fee until otherwise decided."

60.    As of September 2014, Turner and Stewart were still in discussions, but no partnership agreement had ever been finalized, agreed upon or even completed. On or about September 9, 2014, Stewart e-mailed to Turner proposed "partnership term sheets" which reattached the Memorandum, but also added a proposed corporate structure, as well as compiled financial statements for ADG and a "Partnership Distribution Program Update" as of July 23, 2014. A copy of the September 9, 2014 e-mail, and related documents, is attached as **Exhibit F** hereto.

61.    One of the documents related to the September 9, 2014 e-mail was a "Partnership Distribution Program Update" dated 7/23/2014 ("Distribution Update").  As noted above, part of Stewart's proposal included quarterly partnership distributions. The Distribution Update states that although the company had been in "a fast growth mode" and profitable, "it was difficult to allocate an owners' distribution allocation what would pay out enough to appropriately compensate the partners' time, risk and contribution." Recalling that Stewart was supposed to be getting paid $5,470 per month for the new services, plus a capital account credit of $15,400 per month, plus a 12% interest in ADG, but apparently deciding, one or two months of his initial proposal, this just wasn't enough compensation, Stewart further proposed in the Distribution Update that "a minimum distribution escrow of $400,000 was assessed to be a reasonable assumption" and therefore "[a]t the end of every fiscal quarter, a distribution escrow of $100,000 is added to the Partner Distribution Program according to the current levels of ownership: 88% to Britnie [Turner] and 12% to Hugh [Stewart]." The Distribution Update continued:

That means at a minimum, every quarter, Hugh escrows $12,000 in potential owners' distribution and Britnie escrows $88,000. Upon the availability of cash for owner's distribution, the escrows will be satisfied first and then any remaining funds distributed as per the original financial allocations of 88%/12%. In any fiscal quarter, if the disbursement is made without satisfying double Hugh's minimum escrow, the distribution is made 50/50. If in any fiscal quarter, (in any disbursement satisfies the escrow amount for Hugh and not for Britnie, then Hugh's escrow is paid, and the difference of the amount is paid to Britnie until her escrow is satisfied.

The Distribution Update then gives an example, which only serves to show how the proposed distribution provides that Stewart's distribution would be given a priority over Turner's distribution, despite the disparate ownership percentages. The example given is that if there is only $50,000 to distribute, Stewart would get $25,000 and Turner would get $25,000, rather than simply distributing pro-rata according to proposed ownership percentages.

62.     Another document in the package attached as Exhibit F hereto is the "Compiled Financial Statements" for "Aerial Investment Properties, LLC d/b/a Aerial Development Group" for the 9-month period running through September 30, 2013. It is confusing as to why AIP is referred to as a d/b/a for ADG, as AIP was, according to the Tennessee Secretary of State's website, a separate LLC established on or about August 30, 2010, and ADG was established on or about May 30, 2013. Presumably, since Stewart's negotiations to try to obtain a partnership interest in ADG began around the time ADG was formed, he was attempting to also obtain an interest in assets already existing at that time held by AIP, and, therefore, was treating the two entities as one consolidated company.

63.     The fact that Stewart should have been aware these were separate companies, and, as such, required separate financial statements, is demonstrated, in part, by Stewart's attempt to provide services to, and possibly claim an ownership interest in, AIP.

64.     Attached as **Exhibit G** hereto is a draft "Financial Services Agreement" ("FSA") presented by TFC/Stewart to AIP. In the FSA, TFC proposes to contract with "Aerial Investment

Properties, LLC" to serve as AIP's "financial coordinator and cash manager" providing the same sorts of services TFC was supposed to be providing for ADG.

65. It is unclear whether the FSA was ever executed (ADG has no record of an executed copy), or if any services were billed thereunder – what is clear is that the proposed services provided in Paragraph 1 were never provided. Note as well that the FSA states that it will be "controlled and governed by the laws of the State of North Carolina" and purports to have been executed in "the County of Cumberland, State of North Carolina."

66. Moreover, around this same time period, Stewart prepared, on TFC letterhead, a document entitled "Below are some considerations for the redevelopment of AIP and the potential partnership of Britnie Turner and CPFC c/o Hugh Stewart" ("Redevelopment Proposal"), a copy of which is attached as **Exhibit H** hereto.

67. The Redevelopment Proposal states "[t]he Company is currently Aerial Property Investments doing business as Aerial Development Group." Many of the items in the Redevelopment Proposal mirror those in the Memorandum (Exhibit D), and this appears to be an earlier version of the Memorandum. In the Redevelopment Proposal, Turner would receive a salary of only $5,000 per month ($60,000 per year, as opposed to $155,000 in the Memorandum) but Stewart is to receive $2,250/month paid to TFC for bookkeeping and accounting services, plus another $5,500 per month "for the services of Hugh Stewart and Gary Prime – office manager, development engineer, and Fayetteville liaison who will be allocated to AIP as a full time team member." Recall that in the later version of this document – the Memorandum – Stewart proposes he should be paid $5,750 per month for him to provide these exact same services by himself, remotely, from Florida. Why Stewart believed $5,500 was an appropriate amount for two people, one of whom would be full-time on site as an office manager, but $5,750

should be paid to Stewart working alone, remotely, without any participation by Gary Prime, is something to be answered during the discovery process in this case.

68. In any event, despite the fact that the potential partnership discussions were never completed or agreed upon, Stewart billed (and paid himself via ACH) approximately $176,000 for these additional services *over and above* the $139,960.58 billed by TFC for its services under the Contracts. Moreover, two quarterly profit distributions were made in anticipation of reaching an eventual agreement, for a total of another $47,286.78 paid to Stewart by ADG.

69. To date, ADG has calculated that Stewart and/or TFC have received a total of $371,838.63 from ADG/AIP through the acts described above.

70. By late 2014, Turner had finally had enough and begun to realize that Stewart had been taking advantage of her trust and abusing his position and authority over ADG accounts. Therefore, in late 2014/early 2015 Turner engaged the services of Biersmith to review financials and related documents of ADG and AIP for the prior years to determine the actual financial status of the entities and to review for any errors, omissions, statements and improper statements by Defendants.

71. As noted above, Biersmith's review has so far uncovered substantial instances of fraud, misrepresentation, breaches of the Contracts, negligent preparation of financial documents, self-dealing transactions, and what appears to be straight conversion of ADG and AIP funds by Defendants. ADG and AIP continue to investigate their records with the assistance of third-party auditors.

72. At no time did Turner ever reach agreement with Stewart as to the terms of a partnership or ownership interest in the entities. No written partnership agreement was ever

executed, accepted or adopted, nor was any "warrant" ever issued (per the requirements of Exhibit D as the way to transfer to Stewart any ownership interest he may earn). There was no meeting of the minds between Stewart and Turner. Moreover, as is apparent from a review of the documents, the discussions among Turner and Stewart never reached sufficient specificity to form any sort of binding agreement – it was never finally decided which entities (ADG, AIP, or some new entity) would be involved, what entities (Stewart, or TFC) would actually hold any partnership interest, nor was any new entity ever designated per Exhibit D to hold that interest.

73.     Even if any sort of partnership agreement could be inferred or implied on these facts, the existence of which is expressly denied, clearly the numerous breaches of fiduciary, common law and contractual duties set forth above, the absence of any consideration for Stewart's alleged interest, the failure to provide the services proposed, and the self-dealing by Stewart to the detriment of the Company would far outweigh any argument that Stewart should be considered to have any current interest or right to any remuneration from either ADG or AIP.

74.     To the contrary, based on the facts set forth above, it appears that TFC and Stewart should be ordered to disgorge hundreds of thousands of dollars to ADG and AIP, as well as being liable for damages in the form of lost profits, lost opportunity costs, and to-be-determined costs related to reorganizing and restating financial statements and tax filings to remedy the situation.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

75.     The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

76. Pursuant to N.C. Gen. Stat. §§ 1-253 *et seq*., if any actual case or controversy exists regarding whether Stewart possesses any ownership interests in Plaintiffs or their affiliated companies or subsidiaries, Plaintiffs are entitled to a declaratory judgment on this matter.

77. Pursuant to N.C. Gen. Stat. §§ 1-253 *et seq*., Plaintiffs seek a declaratory judgment from this Court establishing the following:

a. Any alleged agreement between the parties purporting to convey an ownership interest in Plaintiffs or their affiliated companies or subsidiaries is unenforceable;

b. That Stewart has no ownership interests in Plaintiffs or their affiliated companies or subsidiaries ; and

c. That no legal partnership or other equity relationship exists between Turner and Stewart with regards to any entity in which Turner has an interest or may claim an interest through an entity in which she holds an ownership interest.

## SECOND CLAIM FOR RELIEF
(Breach of Fiduciary Duties of Good Faith, Loyalty, and Due Care)

78. The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

79. As set forth above, Stewart and TFC owed fiduciary duties of good faith, loyalty and due care to ADG and AIP.

80. The conduct of Stewart and TFC, described above, constitutes a breach of their fiduciary duties.

81. As a result of their breaches, Stewart and TFC have caused ADG and AIP to suffer damages in an amount to be proven at trial but at least in excess of $400,000.

## THIRD CLAIM FOR RELIEF
### (Breach of the Contracts)

82.     The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

83.     In entering into the Contracts, TFC and Stewart made representations, and adopted duties and obligations, to ADG and/or AIP to prepare accurate, complete and timely financial statements.

84.     As set forth above, TFC and Stewart failed to provide the services required by the Contracts, including the failure to prepare many financial statements at all, prepared any of the statements in a timely manner, and to prepare statements that were accurate and met industry standards.

85.     As noted above, TFC and Stewart knew or should have known that a reasonably foreseeable result of their failure to perform their obligations would be to not only cause TFC and Stewart to incur contractual penalties, but would cause damage to ADG and AIP in the form of incorrectly billed fees, loss of ability to conduct business and make decisions, and particularly impair ADG and AIP in their efforts to raise capital.

86.     As a result of their breaches of these duties, Stewart and TFC have caused ADG and AIP to suffer damages in an amount to be proven at trial but at least in excess of $400,000.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract as to the "Special" or "Extra" Consulting Services)

87.     The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

88.    As noted above, Stewart made representations, and adopted duties, to ADG and/or AIP to prepare accurate, complete and timely financial statements and to provide financial consulting and operational management and support.

89.    As set forth above, Stewart failed to provide the services promised, including failing to oversee the work of TFC, failure to provide any of the office management and operational services, and in fact giving advice and recommendations that were self-dealing and to the detriment of ADG and AIP.

90.    As noted above, Stewart knew or should have known that a reasonably foreseeable result of his failure to perform his obligations would cause damage to ADG and AIP in the form of incorrectly billed fees, loss of ability to conduct business and make decisions, and particularly impair ADG and AIP in their efforts to raise capital.

91.    As a result of his breaches of his duties, Stewart has caused ADG and AIP to suffer damages in an amount to be proven at trial but at least in excess of $400,000.

## FIFTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty as an Authorized ACH Account/Bank Account Signatory)

92.    The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

93.    As noted above, based on his recommendations, and as a part of the duties he was to perform, Stewart was made an authorized signatory on ADG bank accounts, and had authority to make authorized withdrawals.

94.    As set forth above, Stewart abused this authority by making ACH withdrawals to himself and to TFC which had not been authorized by Plaintiffs or otherwise under the Contracts.

95.     As a result of his breaches of his duties, Stewart caused ADG and/or AIP to suffer damages in an amount to be proven at trial but at least in excess of $400,000.

96.     Accordingly, the Court should order that a constructive or resulting trust in favor of ADG and AIP be imposed on all funds received by Stewart or TFC through improper ACH withdrawals, that they be required to disgorge the funds received.

### SIXTH CLAIM FOR RELIEF
(Accounting)

97.     The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

98.     In light of the foregoing, TFC and Stewart should be ordered to give a full accounting of all financial transactions with ADG, AIP, or any other company related thereto, from January 1, 2012 through April, 2015, in which TFC, Stewart, or any entity in which Stewart or TFC have an interest.

### SEVENTH CLAIM FOR RELIEF
(Punitive Damages)

99.     The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

100.    Stewart and 's breaches of their duties were malicious, willful and wanton, and entitle ADG and AIP to an award of punitive damages pursuant to N.C. Gen. Stat. § 1D-5, in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF
(Unfair and Deceptive Trade Practices)

101.    The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

102.    The actions of Stewart and, as described above, were in and affect commerce.

103.    The actions of Stewart and, as described above, had the capacity to mislead and deceive ADG and AIP.

104.    The conduct of Stewart and, as described above, constitutes unfair and deceptive acts or practices pursuant to N.C. Gen. Stat. § 75-1.1.

105.    As a result, ADG and AIP have been damaged in an amount to be proved at trial in excess of $400,000.

106.    ADG and AIP are entitled to recover from Stewart and  treble their actual damages, plus interest and attorneys' fees, pursuant to N.C. Gen. Stat. § 75-16.

## NINTH CLAIM FOR RELIEF
(Unjust Enrichment)

107.    The allegations of the preceding paragraphs are incorporated herein by reference as if fully rewritten.

108.    Stewart and wrongfully misappropriated ADG and AIP funds and assets.

109.    Through their actions Stewart and were unjustly enriched in an amount in excess of $400,000.00.

## PRAYER FOR RELIEF

WHEREFORE, ADG and AIP respectfully pray that:

1.    That the Court enter a declaratory judgment as set forth in the First Claim for Relief;

2.    The Court enter an order directing Stewart and TFC to make a full accounting reflecting all moneys received from ADP or AIP; and

3.    Judgment be entered in favor of ADP and AIP and against Stewart and , jointly and severally, and that the Court award compensatory damages, lost profits and interest, in an

amount to be proven at trial, for Stewart and TFC's breaches of their fiduciary and contractual duties; and

4.     The Court order that a constructive or resulting trust in favor of ADG and AIP be imposed on all funds received by Stewart and , and that Stewart and  be required to disgorge the funds received; and

5.     The Court award punitive damages, in an amount to be proven at trial, for Stewart and 's malicious, willful and wanton acts; and

6.     ADG and AIP's compensatory damages be trebled pursuant to N.C.G.S. §75-16, plus an award of attorneys' fees as allowed by N.C. Gen. Stat. §§ 75-16; and

7.     Provide such other and further relief as this court deems just and proper.


Dated:  April 17, 2015

*s/ Erik M. Rosenwood*
Erik M. Rosenwood (NC Bar No. 28049)
M. Aaron Lay (NC Bar No. 38797)
HAMILTON STEPHENS STEELE + MARTIN, PLLC
201 S. College Street, Ste. 2020
Charlotte, NC 28244
Telephone: 704-344-1117 / Facsimile: 704-344-1483
E-mail: erosenwood@lawhssm.com
*Attorneys for Plaintiff Aerial Development Group, LLC and Aerial Investment Properties, LLC*