**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION**

| | |
|---|---|
| AERIAL DEVELOPMENT GROUP, LLC, AERIAL AND ABOVE, LLC, AND AERIAL INVESTMENT PROPERTIES, LLC, | |
| Plaintiffs/Counter-Defendants, | ANSWER, VERIFIED COUNTERCLAIM and THIRD-PARTY COMPLAINT |
| v. | |
| CAROLINA PRIVATE FINANCIAL CORPORATION D/B/A THE FINANCIAL COPILOT AND HUGH O. STEWART, | CASE NO.: 4:15-cv-63-D |
| Defendants/Counter-Plaintiffs. | |

| | |
|---|---|
| CAROLINA PRIVATE FINANCIAL CORPORATION, HUGH O. STEWART, AND SKYLAND BUSINESS SYSTEMS, INC. | |
| Third-Party Plaintiffs, | |
| v. | |
| BRITNIE TURNER, AERIAL BUILDERS, LLC, SKYVIEW GROUP, INC., AND ABOVE HOMES, LLC, | |
| Third-Party Defendants. | |

**NOW COME** the Defendants, Carolina Private Financial Corporation and Hugh O. Stewart ("Stewart") (collectively "Defendants"), and answer the Complaint of the Plaintiffs as follows:

**FIRST DEFENSE
(RESPONSE TO INDIVIDUAL ALLEGATIONS)**

1.      The allegations contained in Paragraph 1 are admitted, upon information and belief.

2.      The allegations contained in Paragraph 2 are admitted, upon information and belief.

3.     The allegations contained in Paragraph 3 are admitted, upon information and belief.

4.     Admitted.

5.     With regard to the allegations contained in Paragraph 5, it is admitted that Stewart is a resident of Florida and that Stewart incorporated the following entities in North Carolina: Carolina Private Financial Corporation, Digital Advertising Technology Associates, LLC, Stewtellus Investments, LLC, Property Solutions of Carolina, Ltd., and Carolina Property Rescue, Inc.  Answering further, Carolina Private Financial Corporation and Carolina Property Rescue, Inc. are the only entities listed above which are currently in existence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

6.     With regard to the allegations contained in Paragraph 6, it is admitted that Stewart is the president of Carolina Private Financial Corporation.    Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

7.     Admitted.

8.     Admitted.

9.     Responding to the allegations contained in Paragraph 9 of the Amended Complaint, Defendants admit that the Court has jurisdiction but deny that venue is proper.

10.     Admitted, upon information and belief.

11.     Responding to the allegations contained in Paragraph 11 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

12.     Responding to the allegations contained in Paragraph 12 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself

and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

13.     Responding to the allegations contained in Paragraph 13 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

14.     Responding to the allegations contained in Paragraph 14 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

15.     Responding to the allegations contained in Paragraph 15 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

16.     Responding to the allegations contained in Paragraph 16 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

17.     With regard to the allegations contained in Paragraph 17, it is admitted that Carolina Private Financial Corporation is a dealer for Intacct software. Answering further, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

18.     Responding to the allegations contained in Paragraph 18 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself

and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

19.     Responding to the allegations contained in Paragraph 19 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

20.     With regard to the allegations contained in Paragraph 20, it is admitted that Stewart is not a licensed Certified Public Accountant and that the only professional license he has held is in the field of engineering.  Answering further, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

21.     With regard to the allegations contained in Paragraph 21, Defendants admit that Stewart gave Turner eight free business coaching sessions.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

22.     With regard to the allegations contained in Paragraph 22, Defendants admit that Stewart provided Turner with eight free business coaching sessions.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

23.     Denied.

24.     With regard to the allegations contained in Paragraph 24, Defendants admit that Turner engaged Carolina Private Financial Corporation to provide certain services for Plaintiffs.

25.     Denied.

26.     With regard to the allegations in Paragraph 26, Defendants admit that Carolina Private Financial Corporation provided certain services to ADG in excess of 20 hours per week to Aerial Development Group; that Aerial Development Group made Stewart a signatory on certain accounts, and that Carolina Private Financial Corporation billed Aerial Development

Group for services provided with consent from Turner. Except as expressly admitted, Defendants deny the remaining allegations contained in said Paragraph.

27.     Denied.

28.     Denied. Answering further, Exhibit A speaks for itself and is its own best evidence. Answering further, the Confident Solutions Coach is a business coaching service which is separate and apart from Carolina Private Financial Corporation's bookkeeping services. Aerial Development Group engaged Carolina Private Financial Corporation to provide business coaching services to Britnie Turner at a discounted rate because Defendant Stewart was promised a partnership interest.

29.     Responding to the allegations contained in Paragraph 29 of the Amended Complaint, Defendants state that the contract attached as Exhibit B speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

30.     Responding to the allegations contained in Paragraph 30 of the Amended Complaint, Defendants state that the contract attached as Exhibit B speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

31.     With regard to the allegations contained in Paragraph 31, Defendants admit that Carolina Private Financial Corporation notified Aerial Development Group and Aerial Investment Properties that it was not able to provide its services within a timely manner. Answering further, Plaintiffs did not provide Defendants with timely financial information and Carolina Private Financial Corporation was not able to provide its services within a timely manner without exceeding the agreement's time requirements of 67 hours per week. As such, Carolina Private Financial Corporation notified Aerial Development Group and Aerial Investment Properties that additional compensation was needed in order to provide the services

listed in the agreement. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

32. Defendants admit that Carolina Private Financial Corporation, Aerial Development Group, and Aerial Investment Group entered into an agreement for $8,250/month. Answering further, Defendants state that the agreement speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

33. Denied.

34. Denied.

35. Defendants are without sufficient knowledge or information upon which to form a belief as to the truthfulness of the allegations contained in Paragraph 35 and, as such, deny the same.

36. Responding to the allegations contained in Paragraph 36 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. With regard to the allegations contained in Paragraph 41, Defendants admit that Carolina Private Financial Corporation withdrew funds for payment as authorized by Turner and Plaintiffs. Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

42.     With regard to the allegations contained in Paragraph 42, Carolina Private Financial Corporation provided additional services to Aerial Development Group outside of the scope of the written agreement with such payments being authorized by Turner as special services.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

43.     With regard to the allegations contained in Paragraph 42, Carolina Private Financial Corporation admits that it withdrew funds from Aerial Development's Group as authorized by Turner and Aerial Development Group.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

44.     Denied.

45.     Denied.

46.     Responding to the allegations contained in Paragraph 46 of the Amended Complaint, Defendants state that the website http://www.financialcopilot.com speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

47.     With regard to the allegations contained in Paragraph 47, Defendants admit that Stewart increased his role with Aerial Development Group by becoming a partner.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

48.     With regard to the allegations contained in Paragraph 48, Defendants admit that Stewart and Turner agreed that Stewart would provide consultation and services at a reduced rate in exchange for an equity interest in Aerial Development Group.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

49.     Denied.

50.     Denied.

51.     Denied.

52.     With regard to the allegations contained in Paragraph 52, Defendants admit that Stewart and Turner agreed that Stewart would provide consultation and services at a reduced rate in exchange for an equity interest in Aerial Development Group.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

53.     With regard to the allegations contained in Paragraph 53, Defendants admit that Stewart provided Turner with the Memorandum attached to the Amended Complaint as Exhibit E.  Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

54.     With regard to the allegations contained in Paragraph 54, Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

55.     With regard to the allegations contained in Paragraph 55, Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

56.     With regard to the allegations contained in Paragraph 56, Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

57.     With regard to the allegations contained in Paragraph 57, Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

58.     With regard to the allegations contained in Paragraph 58, Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

59.     With regard to the allegations contained in Paragraph 59, Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

60.     With regard to the allegations contained in Paragraph 60, Defendants state that Exhibit E speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

61.     With regard to the allegations contained in Paragraph 61, Defendants state that Exhibit F speaks for itself and is its own best evidence.  Answering further, Stewart became a partner of Aerial Development Group, receiving member draws and payment of consulting fees as authorized by Turner and Aerial Development Group.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

62.     With regard to the allegations contained in Paragraph 62, Defendants state that the Distribution Update speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

63.     With regard to the allegations contained in Paragraph 63, Defendants state that the documents attached as Exhibit F speaks for themselves and are their own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

64.     Denied.

65.     With regard to the allegations contained in Paragraph 65, Defendants state that the document attached as Exhibit G speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

66.     Denied.

67.     With regard to the allegations contained in Paragraph 67, Defendants state that the document attached as Exhibit H speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

68.     With regard to the allegations contained in Paragraph 68, Defendants state that the document attached as Exhibit H speaks for itself and is its own best evidence.  Except as expressly admitted, Defendants deny the remaining allegations contained in said paragraph.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Defendants' response to allegations 1-75 are incorporated herein by reference.

77.     Denied.

78.     Denied.

79.     Defendants' response to allegations 1-78 are incorporated herein by reference.

80.     Denied.

81.     Denied.

82.     Denied.

83.     Defendants' response to allegations 1-82 are incorporated herein by reference.

84.     Defendants admit that the parties to this lawsuit had contractual obligations to each other.  Except as expressly admitted herein, denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Defendants' response to allegations 1-88 are incorporated herein by reference.

90.     Defendants admit that the parties to this lawsuit had contractual obligations to each other.  Except as expressly admitted herein, denied.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Defendants' response to allegations 1-93 are incorporated herein by reference.

95.     Defendants admit that Stewart had authority to make authorized withdrawals. Except as expressly admitted herein, denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Defendants' response to allegations 1-98 are incorporated herein by reference.

100.    Denied.

101.    Defendants' response to allegations 1-100 are incorporated herein by reference.

102.    Denied.

103.    Defendants' response to allegations 1-102 are incorporated herein by reference.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Defendants' response to allegations 1-108 are incorporated herein by reference.

110.    Denied.

111.    Denied.

## FIRST AFFIRMATIVE DEFENSE
### (WAIVER)

Plaintiffs are barred from obtaining any of the relief demanded in the Complaint because their conduct, inaction, or both, constitute waiver of any rights which Plaintiffs may have in relation to the alleged claims. For example, Plaintiffs allege that all of Defendants' financial statements were erroneous. Despite this, Plaintiffs failed to properly and timely dispute or object to each financial statement they were provided, and in fact hired Defendants' employees to provide the same services in-house.

## SECOND AFFIRMATIVE DEFENSE
### (CONDITION PRECEDENT)

Plaintiffs are barred from obtaining any of the relief demanded in the Complaint because any alleged breaches are the result of Plaintiffs' failure to provide timely and necessary materials to Defendants for services.

## THIRD AFFIRMATIVE DEFENSE
### (UNCLEAN HANDS)

Plaintiffs are barred from obtaining any of the relief demanded in the Complaint under the doctrine of unclean hands because Plaintiffs have operated pursuant to an oral partnership agreement and accepted all of Defendants work, only to now allege breach in an effort to eliminate Defendant's partnership interest.

## FOURTH AFFIRMATIVE DEFENSE
### (ESTOPPEL)

Plaintiffs are barred from obtaining the relief demanded on the basis of equitable and promissory estoppel.

## FIFTH AFFIRMATIVE DEFENSE
### (ACQUIESENCE AND CONSENT)

Plaintiffs are barred from obtaining the relief demanded in the Complaint because they seek recovery of withdrawals initiated, authorized, and consented to through their conduct.

## SIXTH AFFIRMATIVE DEFENSE
### (IMPOSSIBILITY)

Plaintiffs are barred from obtaining the relief demanded in the Complaint because the breaches which Plaintiffs allege, if any, were impossible to perform because of Plaintiffs' failure to provide necessary materials and information to Defendants.

## SEVENTH AFFIRMATIVE DEFENSE
### (FRAUD)

Plaintiffs are barred from obtaining the declaratory relief demanded in the Complaint because of the fraudulent inducement of Defendants to perform services at a discounted rate in exchange for a partnership interest which Plaintiffs now deny.

## EIGHTH AFFIRMATIVE DEFENSE
### (Inconvenient Forum)

Plaintiffs' claims are barred in whole or in part because they have filed in an inconvenient forum or *forum non conveniens*.

**WHEREFORE,** having fully answered the Complaint of the Plaintiff, Defendants prays the Court as follows:

1.      That the Plaintiff have and recover nothing of this answering Defendant in this action;

2.      For a declaration of the parties' respective partnership interest;

3.      That all issues of fact be tried before a jury;

4.      That the costs of this action be taxed against the Plaintiffs; and

5.      For such other and further relief as the Court may deem just and proper.

## VERIFIED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Come Counter-Plaintiffs and Third-Party Plaintiffs Carolina Private Financial Corporation, Skyland Business Systems, Inc., and Hugh O. Stewart and for their cause of action against Counter-Defendants and Third-Party Defendants Britnie Turner, individually, Aerial Development Group, LLC, doing business as Aerial Capital Partners, Aerial Investment Properties, LLC, Aerial and Above, LLC, Aerial Builders, LLC, Skyview Group, Inc. and Above Homes, LLC respectfully state as follows:

## PARTIES

1.      Counter-Plaintiff and Third-Party Plaintiff Carolina Private Financial Corporation ("CPFC") is incorporated under the laws of North Carolina, and its principal place of business is located at 300 South Pine Island Road, Suite 201, Plantation, Florida 33324.

2.      Third-Party Plaintiff Skyland Business Systems is a Wyoming corporation.

3.      Counter-Plaintiff and Third-Party Plaintiff Hugh O. Stewart ("Mr. Stewart") is a resident of the state of Florida.

4.      Third-Party Defendant Britnie Turner ("Ms. Turner") is, upon information and belief, a resident of Nashville, Davidson County, Tennessee.

5.      Counter-Defendant Aerial Development Group, LLC, doing business as Aerial Capital Partners, (hereinafter, "ADG") is a Tennessee limited liability company whose principal place of business is located at 521 5th Avenue South, Nashville, Tennessee 37203-4211 and whose registered agent for service of process is National Registered Agents, Inc. 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.   Prior to incorporation as a limited liability company ADG operated under the name Aerial Development Group.  Since August 21, 2014, ADG has also conducted business under the assumed name, "Aerial Capital Partners."

6.     Counter-Defendant Aerial Investment Properties, LLC ("AIP") is a Tennessee limited liability company whose principal place of business is located at 521 5th Avenue South, Nashville, Tennessee 37203-4211.  The registered agent for service of process is Britnie Turner who may be served with process at the principal place of business.  AIP operated under the assumed name Aerial Development Group from April 19, 2013 to on or about May 29, 2013.

7.     Counter-Defendant Aerial and Above, LLC ("AAL") is a Tennessee limited liability company whose principal place of business is located at 521 5th Avenue South, Nashville, Tennessee 37203-4211 and whose registered agent for service of process is National Registered Agents, Inc., 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

8.     Third-Party Defendant Aerial Builders, LLC ("ABL") is a Tennessee limited liability company whose principal place of business is located at 521 5th Avenue South, Nashville, Tennessee 37203-4211 and whose registered agent for service of process is Mr. Trey Cain, Cain & Associates, PLLC, 1000 Corporate Center Drive, Suite 125, Franklin, Tennessee 37067-2663.

9.     Third-Party Defendant Skyview Group, Inc. is a Tennessee corporation whose principal place of business is located at 521 5th Avenue South, Nashville, Tennessee 37203-4211 and whose registered agent for service of process is National Registered Agents, Inc., 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

10.     Third-Party Defendant Above Homes, LLC is a Tennessee limited liability company whose principal place of business is located at 521 5th Avenue South, Nashville, Tennessee 37203-4211 and whose registered agent for service of process is Mr. Trey Cain at Cain & Associates, PLLC, 1000 Corporate Centre Drive, Suite 125, Franklin, Tennessee 37067.

## <u>VENUE AND JURISDICTION</u>

11.     This action and the prayer for damages set forth herein arise from Counter-Defendants' and Third-Party Defendants' breach of contracts, implied and oral, unjust

enrichment, *quantum meruit*, misrepresentations, fraud, fraud in the inducement, promissory fraud, and tortious interference.

12.     Contracts at issue were entered into in Nashville, Davidson County, Tennessee, and Counter-Defendants and Third-Party Defendants are either residents of, located within, or have availed themselves of the jurisdiction of Nashville, Davidson County, Tennessee.

13.     Jurisdiction over this cause and venue would be more convenient in the United States District Court for the Middle District of Tennessee in the Nashville Division.

## FACTS

14.     Ms. Turner owns and operates, or otherwise exercises ultimate control and authority over, all business entities named as Counter-Defendants and Third-Party Defendants to this action, save Above Homes, LLC, as well as other related business entities through which she conducts business and secures financing for development projects, including, but not limited to: Alpha One, LLC; Bravo Two, LLC; Charlie Three, LLC; Delta Four, LLC; Echo Five, LLC; East Greenway Park, LLC; Big Picture Properties, LLC; Big City Investments LLC; Sunrise Villas, LLC; and, Inspiration, LLC.

15.     Ms. Turner's development company, ADG, and its related business entities profit by displacing long-time residents, razing their homes, and replacing them with what are locally, infamously referred to as "tall and skinny" residences and other similar cookie-cutter model homes while claiming to "revitalize urban neighborhoods through renovation and infill." Ms. Turner and ADG have provoked the ire of neighborhood advocacy groups and preservationists across Nashville and contributed to the shortage of affordable housing in the city.

16.     Upon information and belief, Ms. Turner has a personal net worth of approximately $16 million, and she also pays herself a stipend of $155,000 per year from ADG.

17.     Ms. Turner habitually spends thousands of dollars of ADG's money on public relations professionals to promote her for personal awards and manufacture a reputation in the Nashville business community as a wunderkind and jet-setting philanthropist.

18.     Upon information and belief, Ms. Turner has spent tens of thousands of her companies' money on at least two personal trips to vacation on Necker Island, a private party island in the British Virgin Islands, to achieve face time with her celebrity business icon.

19.     Ms. Turner has developed a business reputation in the Nashville community through a pattern of conduct in which she creates oral partnerships for the singular purpose of benefiting her and her companies in some manner before unilaterally ending the partnerships when they are of no more use to her or her companies and then disavowing the partnership's existence and ultimately negotiating its dissolution.

## A COACHING BUSINESS RELATIONSHIP

20.     Plaintiffs' business relationship with Counter-Defendants and Third-Party Defendants evolved and grew over time, having originated with Mr. Stewart's offer to provide business advice to Ms. Turner on or around December 10, 2009 soon after her termination from a job as an assistant to a local real estate investor.

21.     Mr. Stewart offered Ms. Turner eight free coaching sessions to help her build a real estate business with no further obligation.

22.     Upon the conclusion of these free coaching sessions, Ms. Turner informed Mr. Stewart that she would return to him for more advice as soon as she could afford him, and she did so from June 2010 to June 2011 when she paid for his advisory services on business issues about which she was previously uneducated.

23.     Ms. Turner heeded Mr. Stewart's advice, and Ms. Turner and ADG realized direct benefits from Mr. Stewart's business acumen and coaching.

24.     From 2010 to 2011, ADG, through AIP, revenue increased from approximately $30,000 to $1.2 million, and assets grew from $150,000 to $749,000.

25.     Again in January 2013, Ms. Turner solicited additional advice from Mr. Stewart due to business growth and her desire to expand into other business areas.  To this end, the two executed a new coaching agreement in February 2013.

## A FINANCIAL SERVICES BUSINESS RELATIONSHIP

26.     On or about November 2011, Mr. Stewart converted CPFC into a bookkeeping and business financial management company, offering financial literacy and service programs to companies generating at least $500,000 in revenue per year.

27.     Mr. Stewart and his coworker Rhonda Crites' earned certifications in Accounting, Taxation, QuickBooks, Microsoft Excel, and Payroll Accounting from the National Association of Certified Public Bookkeepers in Spring 2012 in furtherance of CPFC's new business venture, in addition to their 37 years of combined experience in bookkeeping and accounting.

28.     On or about February 20, 2012, Ms. Turner, on behalf of AIP, contracted with CPFC for services under a Financial Services Agreement (the "Financial Services Agreement"), and CPFC immediately began performing as promised.  The Financial Services Agreement is attached hereto as Exhibit "A."

29.     Because AIP did not meet CPFC's size criteria and could not afford CPFC's regular pricing schedule, CPFC agreed to charge only $1,000 per month for 20 hours of work per month for a term of one year, after which AIP would pay $2,250 per month for 20 hours of work per month.

30.     Between February 2012 and March 2013, AIP and ADG's demand for bookkeeping services increased from 20 hours to over 200 hours per month in some months, requiring CPFC to implement a new time tracking system in July 2013 to measure the time consumed by AIP and ADG.

31.     In 2012, AIP revenue was $4.3 million, and its assets totaled $2.3 million.

32.     In February 2013, due to AIP and ADG's excessive workload, Mr. Stewart and Ms. Turner revisited the original Financial Services Agreement about to expire.

33.     Mr. Stewart communicated several concerns about CPFC's ability to continue performance to Ms. Turner, AIP and ADG's other sub-entities, and the concerns included:  1) AIP and ADG's failure to timely and completely provide financial paperwork, forgotten checks, receipts, and credit card purchases to CPFC for proper entry; 2) Ms. Turner's habit of writing checks and forgetting about them; 3) Ms. Turner's habit of surprising CPFC with last minute payables; 4) missing cash; and, 5) excessive demand for services far exceeding the agreed upon 20 hours per month.

34.     Mr. Stewart and Ms. Turner also agreed on an upcharge agreement as a tool to help CPFC recover lost compensation for excessive work performed outside the scope of the original Financial Services Agreement and to help cover the salary of a certified public accountant who was hired for the specific purpose of providing services to Ms. Turner's rapidly growing companies.

35.     Mr. Stewart and Ms. Turner agreed to a new financial services contract (the "Revised Financial Services Agreement").  Under this contract, Ms. Turner, on behalf of AIP, agreed to pay $2,250 per month for 20 hours of CPFC's services per month.

THE PARTNERSHIP

36.     In April 2013, Ms. Turner knew she required more able assistance and communicated her desire for Mr. Stewart to play a more significant role in her business.  She needed Mr. Stewart's help on a more consistent basis but knew she could not afford to pay his consultant fees that were $300 per hour.

37.     Ms. Turner flew to Fort Lauderdale, Florida to meet with Mr. Stewart, and the pair mutually agreed to an oral partnership agreement (the "Partnership Agreement").

38.     Under the terms of the Partnership Agreement, Mr. Stewart would assist Ms. Turner with the implementation and execution of ADG's operations and systems.  To this end, the pair agreed to implement a system that Mr. Stewart proposed and expected to take approximately two years to reasonably implement with sufficient support and focus.

39.     By July 2013, it was agreed that full implementation could take three to five years because of the number of challenges facing ADG at that time.

40.     In exchange for Mr. Stewart's services under the Partnership Agreement, he would receive twelve percent (12%) ownership of all of the relevant business activities that Ms. Turner participated in, including a very specific list for which he would receive quarterly draws based on mutually agreed-upon distributable cash flow.

41.     Under the Partnership Agreement, it was agreed that Mr. Stewart would receive a monthly stipend of $5,500, which was later increased by agreement to $5,750, for the specific purpose of implementing and executing their agreed upon business plan.

42.     Mr. Stewart paid approximately $4,250 of his monthly stipend to Gary Prime ("Mr. Prime"), a civil engineer with over 25 years of experience in land development to serve as a contractor and ADG's operations manager.

43.     The Partnership Agreement had a trial period from May 2013 to September 2013, and it was agreed Mr. Stewart would be compensated for his capital contribution to the partnership if the partnership was discontinued.

44.     After the summer of 2013, Mr. Stewart and Ms. Turner retroactively agreed that Mr. Stewart's intellectual capital was worth $77,000 to the partnership.

45.     The parties began operating under the agreed upon terms of the Partnership Agreement in May 2013, thus commencing Mr. Stewart's role as a partner with Ms. Turner and a 12% owner of AIP and all of ADG's real estate endeavors through its respective sub-entities, excluding activities related to the following:  415 Church Street #2804, Nashville, TN 37219;

1100 Douglas Avenue, Nashville, TN 37206; 1711 Sevier Street, Nashville, TN 37206; the sale of a 2007 Range Rover; agent commissions generated by Ms. Turner's real estate license; and, any furniture purchased prior to September 30, 2013.

46.     Mr. Stewart performed as promised and flew to Nashville quarterly, and the partners regularly conducted strategic planning sessions.

47.     Other than Ms. Turner, the chief executive officer of ADG, Mr. Stewart, the Vice President of Finance and Operations, served as the only other executive for ADG until December 2014.

48.     Ms. Turner touted Mr. Stewart as her partner to third parties.

49.     In reliance on the Partnership Agreement and Ms. Turner's representations, Mr. Stewart allowed CFPC to continue performing services at substantially reduced rates for far more hours than agreed upon under the Revised Financial Services Agreement.

50.     ADG's prior attempts to implement multiple project management systems had failed so Mr. Stewart's first priority as a partner was to champion the implementation of BuilderTrend and get all vendors, internal users, and the finance team on the same platform with rules around how documents would be tracked and uploaded, how files would be administered, and how the finance team and the new construction department would communicate around the administration of files.

51.     In September 2013, Ms. Turner authorized a $6,818 partnership distribution to Mr. Stewart, the first of what was projected to be a regular quarterly distribution.  This sum was considered to represent Mr. Stewart's 12%, and it was calculated by considering the distribution Ms. Turner had already paid herself and other factors.

52.     On or about December 31, 2013, Ms. Turner personally authorized a second partnership distribution to Mr. Stewart in the amount of $16,466.78.

53.    By January 2014, BuilderTrend had been adopted by all ADG stakeholders, and they were using it to seamlessly pay almost $1.0 million in monthly vendor bills without Ms. Turner's involvement in any manner, except to find the funds to pay vendors when the cash flow was tight.  This significant increase in efficiency allowed ADG to continue to grow, increasing its construction capacity to build in excess of $30 million in homes during 2014.

SECOND REVISED FINANCIAL SERVICES AGREEMENT

54.    By August 2013, time tracking software revealed that AIP and ADG were utilizing more than 270 hours per month of CPFC's bookkeeping time while still only paying for 20 hour per month.

55.    Because of Ms. Turner's representations and in reliance on the Partnership Agreement, Mr. Stewart and CPFC had not charged AIP or ADG any upcharges for the excessive bookkeeping work, as allowed by the Revised Financial Services Agreement prior to August 2013. Mr. Stewart had personally subsidized the additional costs to CPFC to contribute as much value as possible to his partnership stake.

56.    To be able to provide any services, CPFC finally increased the bookkeeping rates charged to AIP and ADG from $2,250 to $5,200 for 268 hours per month.  This resulted in another revised financial services contract between CPFC and AIP and ADG ("Second Revised Financial Services Agreement").  The Second Revised Financial Services Agreement is attached hereto as Exhibit "B."

57.    Mr. Stewart knew that AIP and ADG could not afford more than $5,200 per month so he agreed to a drastically reduced rate of $19.40 per hour, which was well below cost and the market rate of $55.00 per hour.

58.    Mr. Stewart entered into the Second Revised Financial Services Agreement in continued reliance on the terms of the Partnership Agreement.  Had Mr. Stewart not been a partner, he would have charged a market rate of $55.00 per hour, at the least.

59.     The Second Revised Financial Services Agreement also included a deadline for certain reports if AIP and ADG timely provided all necessary documentation to CPFC.

60.     Ms. Turner's overuse of AIP's and ADG's credit cards and her and the company's department heads' inability and failure to timely provide pertinent financial information to CPFC was a constant challenge, causing the issue to become a quarterly project for ADG's annual planning process.

61.     In breach of the Second Revised Financial Services Agreement, AIP and ADG again exceeded the agreed upon 268 hours per month for CPFC's bookkeeping services, sometimes reaching as many as 450 hours per month.

62.     Because of AIP's consumption of CPFC's resources and ADG and its amalgamated entities' growing needs, CPFC was unable to bring on any new bookkeeping customers in 2014 or 2015, resulting in even more lost revenue.

## AN EXPANDED OPERATIONAL ROLE UNDER THE PARTNERSHIP

63.     Mr. Stewart's role in the partnership quickly expanded as he became involved in strategic and tactical matters of ADG's business, legal concerns, other partnership renegotiations, capital fundraising, banking negotiations, insurance issues, and a host of other concerns.

64.     Acting in good faith, Mr. Stewart fully committed himself to Ms. Turner and ADG to perform as promised and make their partnership successful at the expense of his other businesses.

65.     Mr. Stewart had become so integral to ADG and Ms. Turner relied on him so much that she asked Mr. Stewart to serve as interim CEO of ADG while Ms. Turner went on a two-week vacation in November 2013.

66.     By December 2013, ADG consumed approximately 30 hours per week of Mr. Stewart's time, but the financial compensation to him and CPFC had not increased under the Second Revised Financial Services Agreement.  Mr. Stewart and Mr. Prime continued sharing

the $5,750 stipend, with Mr. Prime receiving $4,250 and Mr. Stewart directing his $1,500 share to CPFC to reduce its losses caused by AIP's overutilization of services.

67.     In January 2014, following a discussion with his Ms. Turner, Mr. Stewart offered for CPFC to accept $5,750 per month for him to personally commit a minimum of 20 hours per week to the business.  These increases were agreed to by Mr. Stewart and were necessary after Mr. Prime departed and even more of Mr. Stewart's time was required.

68.     Immediately thereafter, Mr. Stewart's role with ADG extended far beyond his agreed upon role and included spending 20 to 50 hours per week: handling daily emergencies; resolving human resource issues; designing employee incentive compensation programs; preparing bank presentations; preparing Ms. Turner for interviews; filling out Ms. Turner's applications for personal awards; writing recommendation letters; editing marketing collateral and business plans; and, negotiating with disgruntled partners who Ms. Turner wished to cast aside.

69.     Mr. Stewart performed these tasks outside the scope of his agreed upon role, in reliance on the representations of Ms. Turner and the terms of their Partnership Agreement, reasonably believing that he was building equity in a company in which he owned a 12% stake as a partner.

70.     Upon information and belief, in early 2014, a formal, written partnership agreement was drafted by ADG's lawyers upon Ms. Turner's request but never finalized, because Ms. Turner was concerned that any official recognition of Mr. Stewart's partnership in ADG might have an adverse impact on its ability to borrow money.

71.     Despite Ms. Turner's failure to finalize an agreement, Mr. Stewart reasonably believed his 12% partnership interest in ADG was protected because of Ms. Turner's representations to Mr. Stewart and third parties, their pattern of conducting business as partners, and Mr. Stewart's prior receipt of partnership distributions.

72.     In March and April of 2014, Ms. Turner again requested Mr. Stewart to complete a special project and relocate to Nashville for 30 days.

73.     Mr. Stewart and CPFC lost a new client during this 30-day period due to his exclusive focus on the project.

## CONTRACT FINANCE DEPARTMENT 2014 AND DECEMBER 2014 FINANCIAL SERVICES AGREEMENT

74.     Ms. Turner's desire to grow ADG at any cost caused it to quickly outgrow its business model and exceed its administrative capabilities and financial resources.

75.     Contrary to its manufactured public image, ADG was consistently cash strapped and primarily financed or propped up by bank loans intended for new construction.  Almost all of ADG's available cash flow was used to pay outstanding bills and acquire new property, rather than being invested in infrastructure.

76.     In February 2014, ADG was comprised of 10 separate sub-entities, and Rhonda Crites and Mr. Stewart recognized that it was impossible to perform and produce timely financial reports unless ADG either paid for additional resources or shifted to a new accounting platform that would allow for all the separate entities' books to be synergized.

77.     After personal research, Mr. Stewart discovered Intacct, a system that could facilitate all of ADG's bookkeeping needs and allow for all ADG companies' continued growth.

78.     CPFC learned that Intacct implementation would take three months and cost $8,000-$10,000.  Data migration from QuickBooks would cost an additional $10,000-$15,000, and service fees would run between $1,000 and $1,200 per month for the ten ADG sub-entities.

79.     Mr. Stewart worked a deal for CPFC to become an Intacct dealer in exchange for preferred access to Intacct at a heavily reduced cost of only $2,500 per year plus $900-$1,000 per month.   ADG received the service at cost, with no markups, through CPFC, saving the company tens of thousands of dollars in service fees.

80.     Mr. Stewart, on behalf of CPFC, spent hundreds of hours creating the migration software technology to migrate all of ADG's data, as well as it sub-entities' data, from QuickBooks to Intacct, because ADG could not afford the $15,000 data migration costs.

81.     In addition to the 400 plus hours per month that CPFC spent on servicing ADG from July 2014 through November 2014, CPFC spent additional time and ate additional overhead costs to migrate data, build utilities, and work on QuickBooks and Intacct simultaneously so that migration was seamless.  ADG paid nothing for these extra services.

82.     Mr. Stewart and CPFC suffered significant losses in reliance on Ms. Turner's representations and the agreed upon terms of the various financial services agreements and the Partnership Agreement, believing that all money Mr. Stewart saved ADG and AIP would increase the value of his 12% partnership interest.

83.     CPFC only charged a single upcharge to ADG under the agreement in early 2014 when CPFC processed hundreds of 1099's for ADG, and Ms. Turner authorized payment for $240.00.

84.     In December 2014, Ms. Turner, on behalf of ADG, reached a new agreement for CPFC's services, because ADG had grown to 14 sub-entities (the "December 2014 Financial Services Agreement").  The terms of this new agreement included a price point of $8,250 for 320 hours per month, amounting to $25.00 per hour, a significantly subsidized rate below even a minimal market rate of $55 per hour.  The December 2014 Financial Services Agreement is attached hereto as Exhibit "C."

## AERIAL CAPITAL PARTNERS

85.     In Fall 2013, upon Mr. Stewart's recommendation, ADG set about building its apartment and multi-family development portfolio through a venture originally named "Aerial and Above."  It would later be named Aerial Capital Partners ("ACP").

86.     ACP was a joint venture in which Ms. Turner's Skyview Group, Inc. owned 51%, Christian Longcrier's Above Homes, LLC owned 30%, and Mr. Stewart's Skyland Business Systems owned 19%.

87.     For ACP, each partner had specific roles:  Ms. Turner used her balance sheet, which was then valued at $10 million using a net asset value approach structured by Mr. Stewart and thanks to CPFC's cash management and strategic advice services; Mr. Longcrier found the deals and ran the pro forma on each; and, Mr. Stewart ran the equity investor return analysis, negotiated with equity investors, streamlined the offer process, worked to close on properties, and managed financial integration with the property management firm after property was acquired.

88.     On or about April 1, 2014, they closed on Hermitage Gardens through the single-purpose entity, Aerial and Above, LLC.  After sharing profit distributions with equity partner, Jeff Lerman, Ms. Turner, Mr. Longcrier and Mr. Stewart divided the cash balance among themselves, as agreed upon.

89.     To this date, Mr. Stewart has only received approximately $2,200 in distributions from this property.  Upon information and belief, this is much less than the 19% share of profits to which he is entitled.

90.     During 2014 and 2015, Mr. Stewart analyzed and administered deals for five multi-family developments, including Southwood Apartments in Knoxville, Tennessee and Sunrise Villas in Savannah, Georgia, projects for which he has not been paid for his work under the ACP joint venture.

91.     As of April 2015, Ms. Turner stopped all distributions to Mr. Stewart for the multi-family complexes and inexplicably disavowed Mr. Stewart's stake in them.

A ONE-SIDED BUSINESS RELATIONSHIP

92. Mr. Stewart repeatedly communicated with Ms. Turner throughout 2014 and 2015 about the financial strain he and CPFC were under because of their substantial investment of resources into AIP that were outside the scope of the financial services agreement

93. In September 2014, as part of their partnership, Ms. Turner and Mr. Stewart agreed on a minimum quarterly distribution of a minimum of $12,000 per quarter, as well as any remaining balance earned when a large piece of property was sold or another cash event took place.

94. In line with their agreement, Mr. Stewart received a total combined distribution of $24,000 for the first and second quarters of 2014.

95. Ms. Turner did not pay the third quarter of 2014 minimum distribution, because she said she did not need hers and, instead, redirected available funds to pay for a cruise.

96. On or around January 2015, against Mr. Stewart's advice, Ms. Turner expended more of ADG's money to take a trip to Africa.

97. In December 2014 and January 2015, Ms. Turner and Mr. Stewart directed cash to hire a chief investment officer and a chief operations officer for salaries of $128,000 and $168,000, respectively.

98. Immediately after the new chief operations officer was hired, the business climate at ADG changed. Mr. Stewart and CPFC were spontaneously and completely shut out virtually overnight.

99. CPFC employees were no longer invited to weekly ADG business meetings for the first time in two years. Mr. Stewart, a partner, was purposefully excluded from business meetings and decisions and denied access to ADG's strategic objectives reporting system.

100. As is her custom with partners she deems expendable, Ms. Turner stopped taking Mr. Stewart's telephone calls and abruptly ceased communications with him without warning or explanation.

101.    Ms. Turner and ADG then hired CPFC's Rhonda Crites from under Mr. Stewart after inducing him to believe that allowing Ms. Crites to leave CPFC and work for ADG would increase the value of Mr. Stewart's stake in ADG.  After hiring Ms. Crites, ADG then hired the other staff located at the CPFC office.

102.    ADG operated in CPFC's Fayetteville office during the week of April 13, 2015 using all of the company's equipment and utilities with no permission or benefit to CPFC or Mr. Stewart.

103.    Rather than honoring her partnership commitment to Mr. Stewart, addressing ADG's ongoing overutilization of CPFC's resources for which substantial compensation was owed, and paying all agreed upon minimum distributions to Mr. Stewart, Ms. Turner chose the path most often taken by her and unilaterally terminated her relationship with Mr. Stewart and CPFC, fabricating her justification for doing so and effectively claimed that no partnership ever existed.

104.    Contemporaneously, ADG ushered the former-CPFC staff out of CPFC's office and attempted to coerce Mr. Stewart into signing a settlement agreement by threatening a lawsuit.

105.    One day later ADG set up an office on the floor above CPFC's office suite in North Carolina and subsequently hired more CPFC staff who had worked on ADG's books, thus depleting Mr. Stewart's staff and eliminating his opportunity to operate CPFC and provide services to other customers.

## COUNT I.  BREACH OF CONTRACTS

106.    The facts, information, and assertions set forth in paragraphs 1-105 above are incorporated by reference, as if fully set forth herein.

107.    For consideration, Mr. Stewart and Ms. Turner mutually agreed and entered into an oral contract in the form of a Partnership Agreement and a joint venture, promising to work

together to further the purpose of the Counter-Defendant and Third-Party Defendant business entities and benefit all parties.

108. For consideration, Third-Party Defendants Skyview Group, Inc., Above Homes, LLC, and Skyland Business Systems mutually agreed and entered into an oral contract for the purposes of a joint venture named Aerial and Above, and later Aerial Capital Partners, promising to work together to further the purpose of the Third-Party Defendant business entities and benefit Third-Party Plaintiffs and Third-Party Defendants alike.

109. For consideration, Mr. Stewart, on behalf of CPFC, and Ms. Turner, on behalf of ADG and AIP, entered into a series of documented financial services agreements with specific terms for an amount of service hours to be provided per month at a set rate.

110. Mr. Stewart, CPFC and Skyland Business Systems performed as promised at all times.

111. Ms. Turner performed as promised and mutually agreed upon under the Partnership Agreement for a period of time, thus proving the existence of the oral partnership contract, before Ms. Turner materially breached the Partnership Agreement.

112. Skyview Group, Inc. and Above Homes, LLC materially breached their oral contract with Skyland Business Systems by failing to pay the agreed upon 19% due it.

113. AIP and ADG repeatedly materially breached the series of financial service agreements by far exceeding the amount of hours for which they contracted.

114. Third-Party Plaintiffs suffered substantial damages as a direct and proximate result of all material breaches of the respective contracts.

<u>COUNT II.  UNJUST ENRICHMENT</u>

115. The facts, information, and assertions set forth in paragraphs 1-114 above are incorporated by reference, as if fully set forth herein.

116.     Mr. Stewart and CPFC, by and through Mr. Stewart, conferred upon Ms. Turner, personally, and all Counter-Defendant and Third-Party Defendant business entities the benefit of their expertise in business management, bookkeeping and business consulting services.

117.     Counter-Defendants and Third-Party Defendants appreciated the benefits conferred upon them by Mr. Stewart and CPFC, by and through Mr. Stewart.

118.     Counter-Defendants and Third-Party Defendants received and directly benefitted from Mr. Stewart's and CPFC's experience and services, but it failed to fully and adequately compensate them for their services.

119.     Counter-Defendants and Third-Party Defendants accepted the benefits of Mr. Stewart's and CPFC's services, by and through Mr. Stewart, under such circumstances that it would be inequitable for Defendants to retain the benefit of same without payment of the value thereof.

120.     The benefits to Counter-Defendants and Third-Party Defendants would be unjust should Mr. Stewart and CPFC remain uncompensated.

## COUNT III.  *QUANTUM MERUIT*

121.     The facts, information, and assertions set forth in paragraphs 1-120 above are incorporated by reference, as if fully set forth herein.

122.     Mr. Stewart and CPFC, by and through Mr. Stewart, performed and provided valuable services to Counter-Defendants and Third-Party Defendants, which received said services.

123.     Counter-Defendants and Third-Party Defendants knew or should have reasonably understood that Mr. Stewart and CPFC, by and through Mr. Stewart, provided the valuable services with an expectation to be compensated for them.

124.     Counter-Defendants and Third-Party Defendants have failed to pay Mr. Stewart and CPFC for their valuable services from which Defendants directly benefitted.

125.     The circumstances under which Mr. Stewart and CPFC, by and through Mr. Stewart, provided its valuable services demonstrate that it would be unjust for Counter-Defendants and Third-Party Defendants to benefit from these services without financially compensating Mr. Stewart and CPFC for same.

## COUNT IV.  MISREPRESENTATION

126.     The facts, information, and assertions set forth in paragraphs 1-125 above are incorporated by reference, as if fully set forth herein.

127.     Ms. Turner made representations of present or past material facts that were false.

128.     Ms. Turner knew that her representations were false when made or she made the representations recklessly without knowing whether they were true or false.

129.     Ms. Turner intended for Mr. Stewart and CPFC to rely upon her representations and act or not act in reliance on them.

130.     Mr. Stewart and CPFC did not know that the representations were false, and Mr. Stewart and CPFC were justified in reasonably relying upon the truth of Ms. Turner's representations.

131.     As a direct result of Mr. Stewart's and CPFC's reliance upon the truth of Ms. Turner's representations, Mr. Stewart and CPFC sustained substantial damages.

## COUNT V.  PROMISSORY FRAUD

132.     The facts, information, and assertions set forth in paragraphs 1-131 above are incorporated by reference, as if fully set forth herein.

133.     Ms. Turner and ADG, by and through Ms. Turner, made promises as to material matters to Mr. Stewart and CPFC.

134.     At the time the promises were made, ADG and Ms. Turner did not intend to perform them.

135.    Ms. Turner and ADG, by and through Ms. Turner, made the promises with the intent to deceive and to induce Mr. Stewart and CPFC to rely upon it and to act or not act in reliance upon it.

136.    Mr. Stewart and CPFC were unaware that Ms. Turner and ADG, by and through Ms. Turner, did not intend to perform the promises.

137.    Mr. Stewart and CPFC acted in reliance upon the promises and were justified in relying upon the promises made by Ms. Turner and ADG, by and through Ms. Turner.

138.    As a result of the reliance upon the promises, Mr. Stewart and CPFC sustained substantial damages.

## COUNT VI.  FRAUD

139.    The facts, information, and assertions set forth in paragraphs 1-138 above are incorporated by reference, as if fully set forth herein.

140.    Ms. Turner and ADG, by and through Ms. Turner, intentionally misrepresented one or more material facts or intentionally produced a false impression in order to mislead Mr. Stewart and CPFC.

141.    Ms. Turner and ADG, by and through Ms. Turner, made an intentional misrepresentation of an existing material fact.

142.    Ms. Turner and ADG, by and through Ms. Turner, possessed knowledge of the representation's falsity.

143.    Mr. Stewart and CPFC suffered damages by reasonable relying on Ms. Turner's misrepresentation.

144.    Mr. Stewart's and CPFC's damages were directly caused by Ms. Turner and ADG, by and through Ms. Turner.

## COUNT VII.  FRAUD IN THE INDUCEMENT

145.    The facts, information, and assertions set forth in paragraphs 1-144 above are incorporated by reference, as if fully set forth herein.

146.    Ms. Turner made one or more false statements and misrepresentations concerning a fact material to the transactions into which she entered with Mr. Stewart and CPFC.

147.    Ms. Turner possessed knowledge of the statement's falsity or had utter disregard for its truth.

148.    Ms. Turner intended to induce Mr. Stewart's and CPFC's reliance on the statement.

149.    Mr. Stewart and CPFC's reliance on the statements was reasonable under the circumstances.

150.    Mr. Stewart and CPFC suffered injuries and substantial damages as a direct result of their reliance on Ms. Turner's statement.

## COUNT VIII.  TORTIOUS INTERFERENCE

151.    The facts, information, and assertions set forth in paragraphs 1-150 above are incorporated by reference, as if fully set forth herein.

152.    CPFC had prospective business relationships with an identifiable class of persons.

153.    ADG and Ms. Turner had knowledge of those prospective relationships.

154.    CPFC's business relationships ended or never came to be.

155.    ADG and Ms. Turner intentionally by improper motive or improper means caused the relationships to end or never come to be.

156.    ADG and Ms. Turner's action caused substantial damages to Mr. Stewart and CPFC.

## **PRAYER FOR RELIEF**

WHEREFORE, Counter-Plaintiffs and Third-Party Plaintiffs pray for the following relief:

1.     that process be issued and served upon Counter-Defendants and Third-Party Defendants requiring them to appear and file an Answer to this Counterclaim and Third-Party Complaint;

2.     that they be awarded damages in the amount of $1,674,308.61 against all Counter-Defendants and Third-Party Defendants Britnie Turner and Aerial Builders, LLC for the causes of action asserted herein.

3.     that they be awarded damages in the amount of $61,794.73 against Third-Party Defendants Skyview Group, Inc.'s and Above Homes, LLC's for their breach of the Aerial Capital Partners joint venture agreement;

4.     that they be awarded punitive or treble damages, reasonable attorney's fees, expenses and costs of this cause against Britnie Turner and ADG for the intentional and fraudulent conduct;

5.     that post-judgment interest be awarded to Counter-Plaintiffs and Third-Party Plaintiffs at the statutory rate; and,

6.     that this honorable Court grant any other such relief as it deems just and proper.


Respectfully submitted, this the 14th day of July, 2015.


/s/ Jeffrey A. Doyle
Jeffrey A. Doyle
James R. Baker
Attorney for Defendants
Hedrick Gardner Kincheloe & Garofalo, LLP
4131 Parklake Avenue, Suite 300
Raleigh, NC 27612
Phone: (919) 832-9424
Fax: (919) 832-9425
Email: jdoyle@hedrickgardner.com
State Bar No. 19916
LR 83.1 Counsel for Counter-Plaintiffs and Third-Party Plaintiffs on the Counterclaim and Third-Party Complaint

/s/ John Ray Clemmons
John Ray Clemmons
TN State Bar No. 25907
J. Michael Clemons
TN State Bar No. 24362
Attorneys for Counter-Plaintiffs and Third-Party Plaintiffs
Clemmons & Clemons, PLLC
211 Union Street, Suite 102
Nashville, Tennessee 37201
Telephone: (615) 823-1201
Facsimile:  (615) 823-1194
Email:  johnray@clemlawfirm.com
Email:  michael@clemlawfirm.com

## **VERIFICATION**

**STATE OF** <u>FloRiDA</u> )
)
**COUNTY OF** <u>BroWARD</u> )

I, Hugh Stewart, as an individual and in my capacity as owner of Carolina Private Financial Corporation, Plaintiffs in the foregoing Verified Complaint, hereby make oath that the facts stated and contained therein are true and correct to the best of my knowledge, information and belief and that the Complaint is not made out of levity or in collusion with Defendants, but in truth and in sincerity for the causes contained therein.

_____
HUGH O. STEWART

Sworn to and subscribed before me this <u>14</u>th day of July, 2015.

_____
NOTARY PUBLIC

Nicolas Rodriguez
State of Florida
MY COMMISSION # FF 4706
Expires: April 3, 2017

My Commission Expires:

## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2015, I electronically filed the foregoing ANSWER, VERIFIED COUNTERCLAIM and THIRD-PARTY COMPLAINT and, I hereby further certify that I served this document electronically pursuant to Local Civil Rule 5.1(b) upon all registered users of CM/ECF; and upon all other non-registered parties or attorneys pursuant to Rule 5 of the Federal Rules of Civil Procedure by depositing a copy in the care and custody of the United States Postal Service with proper postage affixed thereon this 1st day of July 2015, and addressed as follows:

> Erik M. Rosenwood
> Attorney for Plaintiffs
> Hamilton Stephens Steele + Martin, PLLC
> 201 S. College Street, Suite 2020
> erosenwood@lawhssm.com

By:     /s/ Jeffrey A. Doyle
        Jeffrey A. Doyle
        Attorney for Defendants
        Hedrick Gardner Kincheloe & Garofalo, LLP
        4131 Parklake Avenue, Suite 300
        Raleigh, NC 27612
        Phone: (919) 832-9424
        Fax: (919) 832-9425
        Email: jdoyle@hedrickgardner.com
        State Bar No. 19916
        LR 83.1 Counsel for Counter-Plaintiffs and Third-Party Plaintiffs on the Counterclaim and Third-Party Complaint